UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DONOVAN BARTLET and AMBER                )
BARTLETT, Individually, and as parent    )
and next friends of JOHN DOE, a          )
disabled minor.                          )
                                         )
                                         )
        Plaintiffs,                      )
                                         )
            vs.                          )
                                         )   No:
WALLACE CCSD 195  BOARD OF               )
EDUCATION d/b/a WALLACE CCSD 195         )   **PLAINTIFF DEMANDS TRIAL BY JURY**
SCHOOL DISTRICT, MIKE MATTESON,          )
Superintendent at Wallace Community      )
Consolidated School District, JOE        )
LANDERS, Principal at Wallace Grade      )
School.                                  )
                                         )
        Defendants.                      )

## COMPLAINT AT LAW

NOW COME the Plaintiffs, JOHN DOE, a minor by and through his Next Friends DONOVAN

BARTLETT and AMBER BARTLETT by and through their attorneys, KREAMER LAW GROUP, LLC., and

for their Complaint at Law against the Defendants, WALLACE CCSD 195 BOARD OF EDUCATION d/b/a

WALLACE CCSD 195 SCHOOL DISTRICT, MIKE MATTESON, Superintendent at Wallace Community

Consolidated School District 195, and JOE LANDERS, Principal at Wallace Grade School, states as follows:

## PARTIES

1.      Plaintiff  John Doe, is a minor and an individual citizen of Illinois, residing in  Ottawa,

Illinois. During all times relevant was a student at Wallace Grade School.

2.      Plaintiff Donovan Bartlett is the Father of John Doe, and an individual citizen of Illinois,

residing in Ottawa, Illinois.

3.      Plaintiff Amber Bartlett is the Mother of John Doe, and an individual citizen of Illinois,

residing in Ottawa, Illinois.

1

4. Defendant Wallace CCSD 195 Board of Education d/b/a Defendant Wallace CCSD 195, is a political subdivision of the Illinois State Board of Education, located in LaSalle County, Illinois. The school district serves approximately 412 students throughout its 2 traditional district schools. Wallace CCSD 195 is headquartered at 1463 N. 33rd Rd., Ottawa, IL 61350.

5. Defendant Mike Matteson is the former Superintendent of Wallace CCSD 195 and was at all times relevant the Superintendent of Wallace CCSD 195.

6. Defendant Joe Landers is and was at all times relevant the Principal at Wallace Grade School.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §1331 and redressing violations of civil rights pursuant to 28 U.S.C. §1343, as well as supplemental jurisdiction over Illinois state law claims pursuant to 28 U.S.C. §1367.

## RELEVANT FACTS

8. Plaintiff John Doe is and was at all times relevant a student Wallace Grade School (hereinafter, "WGS") during the 2021 – 2022 school year and the 2022 – 2023 school year.

9. During Plaintiff John Doe's 6th and 7th grade years at Wallace Grade School, he was bullied repeatedly.

10. During one incident multiple students within Plaintiff John Doe's class repeatedly harassed Plaintiff, calling him names and lying to the teacher by saying Plaintiff was using racial slurs against them. When Plaintiff reported this to the teacher, he was told she would "investigate it," however the bullying and mistreatment did not stop.

11. During a separate incident, Plaintiff John Doe was speaking to the Social Worker at the

time, at Defendant WGS and she informed Plaintiff that other students were making fun of him because he did not know how to do math. The former Social Worker said she would "work something out" with Plaintiff's math teacher, however, the harassment did not stop.

12.     In response to this, A. Bartlett asked Plaintiff  John Doe's math teacher, Mrs. Masley if John Doe could be put into an Intervention Math class or receive some additional help with math. Mrs. Masley responded by telling A. Bartlett she, "would not know how to go about it."

13.     Additionally, Mrs. Masley told Plaintiff John Doe during class that she did not understand why he did understand the work she had already explained three times, and no further help was given. Plaintiff John Doe became a constant target for bullying for being "stupid" and for not understanding.

14.     At the end of the first quarter grading period, another student in Plaintiff John Doe's math class showed the class John Doe's failing math grade and bullied him for being stupid. A. Bartlett again spoke to Mrs. Masley regarding John Doe's need for help and the bullying he was facing.

15.     In June of 2022, at the end of Plaintiff John Doe's 6th grade year, on the second to last day of school, multiple students took part in shoving Plaintiff during recess. This was witnessed by a teacher, who demanded the students stop shoving Plaintiff, and they did.

16.     At the beginning of Plaintiff John Doe's 7th grade year, A. Bartlett presented to Defendant Joe Landers (hereinafter, "Defendant Landers") a letter from a Dr. Marccini that suggested Plaintiff John Doe suffered from dyscalculia (a learning disorder that affects a person's ability to understand number-based information and math) and that he should be tested. It was at this time that staff suggested Plaintiff John Doe be enrolled in special education.

17.     At the beginning of the second quarter, Plaintiff A. Bartlett was informed by Defendant

3

Landers that he had spoken to the school's psychologist, Mr. Gallagher who informed him he did not know how to test for dyscalculia and that Plaintiff would be enrolled in math intervention.

18. A copy of the doctor's letter was also given to Plaintiff John Doe's math teacher, Mrs. Kathy Ferko. Mrs. Ferko expressed to Plaintiff A. Bartlett that Plaintiff John Doe was getting very emotional and frustrated in class when he did not answer something correctly, and suggested Plaintiff John Doe speak to a social worker. Plaintiff A. Bartlett tried to explain that there was an ongoing issue between Plaintiff John Doe and another student (the same student that harassed him in 6th grade), and that the harassing student was saying inappropriate things, trying to provoke Plaintiff John Doe.

19. Mrs. Ferko told Plaintiff A. Bartlett that Plaintiff John Doe was, "at a crossroads in which direction he was going to take in life," and again suggested that she speak to a social worker. Plaintiff A. Bartlett spoke with a Julie Kirkpatrick and explained the multiple incidents of relentless bullying Plaintiff John Doe had suffered and that he was miserable at school. Ms. Kirkpatrick spoke with Plaintiff John Doe on multiple occasions and reported back to Plaintiff A. Bartlett that Plaintiff John Doe, "just really hates school." Other insights included that if he doesn't report the names of those bullying him, no one can help him and that he needs, "better coping skills to deal with the bullying."

20. Plaintiff John Doe during this time participated in Power Hour, designed to help him with his math, for nine weeks. At the end of the nine weeks, Plaintiff John Doe recorded a minor improvement to his score on an Aimsweb test and was removed from Power Hour. Throughout this period, Plaintiff John Doe was continually bullied for needing extra help and for being stupid. Plaintiff John Doe continued to struggle with math after his removal from Power Hour.

21. On multiple occasions Plaintiff A. Bartlett informed WGS staff that her son, Plaintiff John Doe was being bullied and the names of the individuals taking part in the acts. Additionally,

4

multiple teachers had either witnessed certain acts of bullying or been told about them, including the names of the individuals perpetrating the acts. WGS knew or should have known the identities of all the offenders.

22.     On or about October 20, 2022, Plaintiffs A. Bartlett and John Doe went to the office at WGS to report yet another incident of bullying when another student called Plaintiff John Doe a, "fucking snitch," and tried repeatedly to physically assault Plaintiff. This incident occurred after Plaintiff John Doe informed Defendant Landers that the same individual who assaulted him brought a fake gun on the bus the week before.

23.     Defendant Landers was unaware of the incident that happened on the bus and told Plaintiff' John Doe that it was a matter that would need to be dealt with. The following afternoon, on or about, October 21, 2022, the same student that had bullied Plaintiff John Doe the day before sat in the Plaintiff's seat on the bus and insisted that if Defendant Landers asked him about what happened that Plaintiff needed to lie. Plaintiff John Doe asked this student to get out of his seat, but the student refused. This incident was also reported to Defendant Landers via email correspondence.

24.     On the same day as the incident described above, on or about October 20, 2022, during physical education class, Plaintiff John Doe was in the NW corner of the gym participating in class activities when two of the students that had continually bullied Plaintiff started in on him again, telling him to "kill himself," challenging him to fight, calling him a "pussy," during this time other students joined in challenging Plaintiff to fight the other student. The incident culminated with the student that challenged Plaintiff to fight calling Plaintiff a, "stupid fucking nigger," and others chiming in again that Plaintiff should, "go fucking kill yourself," while other just stood and watched and laughed.

25.     In a separate incident later in the day on or about October 20, 2022, the same student that

5

challenged Plaintiff John Doe to fight him was overheard by Plaintiff telling another student that he was going to, "bring my fucking knife and stab him in the throat," if Plaintiff did show up to fight him and again encouraged Plaintiff to fight him at his house, at school, or at Ottawa Hight School.

26.     Plaintiff A. Bartlett spoke to the physical education teacher, Mr. Patrick Allen, and explained the bullying and threats that had taken place during his class, including Plaintiff John Doe being challenged to a fight. Mr. Allen's only response was that his, "money is on Sam."

27.     Incredibly, Plaintiff John Doe's day continued to get worse, while he waited in his homeroom class for the bus, he was pushed from behind by another student, completely unprovoked.

28.     While each and every one of these incidents was either witnessed or reported to WGS staff, all of these incidents were reported again on or about April 3, 2023, to Defendant Landers during an in-person meeting between Defendant Landers and Plaintiffs A. and D. Bartlett.

29.     On or about December 15, 2022, again in Mr. Allen's PE class, Plaintiff John Doe had bent down during a game called Gaga Ball, when another student reached over and clawed Plaintiff John Doe's hand, leaving him with multiple lacerations on his palm. When Plaintiff felt pain and saw blood, he asked the perpetrating student, "What the fuck?" The student then responded by stating that Plaintiff had attempted to punch him. When Plaintiff stated that he did not attempt to punch him, the student responded by telling Plaintiff to, "Quit being a fucking pussy and get over it." Mr. Allen was made aware of the situation and brought Plaintiff multiple band-aids, but when they would not stick, Plaintiff asked to go the nurse's office.

30.     Later that same morning, on or about December 15, 2022, while Plaintiff John Doe was in his math class, his teacher Mrs. Ferko noticed the wounds on his hand and sent him back to the nurse to be bandaged. On this same day, Plaintiff's Mother took pictures of the wounds on

Plaintiff's hand. When it was reported to the school, she explained that only a portion of the hand was pictured, since some of the injuries were unrelated to the incident in PE class. Sometime on or about December 16 or December 17, 2022, Plaintiff A. Bartlett reported the incident to Mr. Allen, disclosing the student's name responsible for all the lacerations on Plaintiff John Doe's hand. Mr. Allen replied, "That's not what Sam said."

31.     On or about December 15, 2022, Plaintiff John Doe was sitting in the bleachers for the winter choir concert when two female students began saying, "Stop! Stop! Stop doing that!" Plaintiff turned around and asked them what he was doing wrong. At this time the female students responded that he was "sexually harassing" them. When Plaintiff stated he was "just sitting here," the two students stated, "that sounds like sexual harassment to us." Both of the female students' mothers works at WGS.

32.     During the event in the gym, multiple teachers were sitting in near proximity to Plaintiff John Doe. After the incident with the female students, Plaintiff John Doe sat with his head in his hands, looking down. One of the teachers, Ms. Bridget Cantlin was nudged by Plaintiff's math teacher Mrs. Ferko, who pointed to Plaintiff John Doe. Ms. Cantlin in turn spoke to Plaintiff, who looked at her while she spoke to him, but then put his head back down. Once Plaintiff put his head back down, Ms. Cantlin inexplicably made a hand gesture toward Plaintiff's head, as if she were going to slap the back of it. Mrs. Ferko then stepped in and changed positions with Ms. Cantlin, so she could speak with Plaintiff. Mrs. Ferko explained that the students who were performing had worked hard and that he should not be sleeping during their performance.

33.     This entire scene played out in front of Plaintiff A. Bartlett, as she was sitting just in front of Mrs. Ferko and Ms. Cantlin.

34.     On or about December 16, 2022, following the incident in the bleachers, Plaintiff A. Bartlett spoke to Ms. Cantlin to let her know that Plaintiff John Doe did not intend to be disrespectful during

the concert, but that he was experiencing a lot of angst after being bullied all day the prior day before and during the performance. Plaintiff A. Bartlett also explained that she witnessed the gesture made by Ms. Cantlin and felt that it was inappropriate. Toward the end of the day, Plaintiff A. Bartlett received an email from Mrs. Ferko requesting to see Plaintiff A. Bartlett, as she did not appreciate the way Plaintiff confronted Ms. Cantlin. Plaintiff A. Bartlett proceeded to apologize to both women in order to keep peace in the workplace.

35.    On or about the following Monday, December 19, 2022, Plaintiff A. Bartlett made Mrs. Ferko aware of physical wounds suffered by Plaintiff John Doe and the inappropriate things the female students had said to Plaintiff John Doe during the concert. When given the option to observe photographs of Plaintiff John Doe's injuries to his hand, Mrs. Ferko replied that she "had a weak stomach," and declined. Additionally, Plaintiff A. Bartlett apologized to Ms. Cantlin for hurting her feelings; however, at no point did anyone address the situation and the treatment of Plaintiff John Doe.

36.    In an additional instance in December of 2022, Plaintiff John Doe was again threatened and bullied by two of the same students that had been perpetually bullying Plaintiff. In the first instance, the student told Plaintiff he was going to go to Plaintiffs house and beat him up. Threatening to break into the family's home and beat up Plaintiff John Doe.

37.    On or about March 30, 2023, multiple reports were made regarding a threat to WGS. The reports were made by students and stemmed from a track meet. An investigation was launched in response to the reports.

38.    On or about Friday March 31, 2023, at approximately 7:50 a.m. Defendant Landers called Plaintiff A. Bartlett to ask if Plaintiff John Doe was on the bus yet. Defendant Lander went on to inform Plaintiff A. Bartlett that he has received multiple "credible threats" that Plaintiff John Doe was going bring a gun to school. Defendant Landers asked Plaintiff A. Bartlett to bring him to

8

school, so that Plaintiff John Doe would not ride the bus. Plaintiffs Donovan Bartlett (hereinafter, "D. Bartlett" or "Father") and A. Bartlett complied.

39. At approximately 8:05 a.m. on Friday, March 31, 2023, Plaintiff John Doe's Mother took him to school. Approximately one minute later, Plaintiff A. Bartlett received a call from Lisa Carlson, who stated Defendant Landers had asked her son (a friend of Plaintiff John Doe) if Plaintiff John Doe was going to bring a gun to school that day. Ms. Carlson reported this happened on speaker phone in her home, and that Defendant Landers used Plaintiff John Doe's name repeatedly.

40. From approximately 8:15 a.m. to 8:30 a.m. Plaintiffs D. Bartlett and John Doe met with Defendant Landers in his office, where he questioned Plaintiff John Doe and searched his backpack and coat.

41. Once Plaintiff John Doe was sent to class, he spent the remainder of his day being harangued and harassed by students at WGS, asking him how his plan to shoot up the school was going, making gun motions with their hands, being told by certain students that they did not start the rumor that he was going to shoot up the school. Plaintiff asked repeatedly to be left alone but was met with more gun motions and harassment. Plaintiff had to deal with this until he finally left to go speak with LaSalle County Sheriff's Office Detectives around 2:45 p.m. There were multiple students that also witnessed the harassment throughout the day.

42. Between 8:30 a.m. and 9:00 a.m. Plaintiff A. Bartlett witnessed a LaSalle County Sheriff's Deputy enter the school building. Plaintiff asked Defendant Landers if the deputy was there for Plaintiff John Doe, to which he did not confirm nor deny.

43. On or about Friday, March 31, 2023, at approximately 11:17 a.m., Defendant Mike Matteson (hereinafter, "Defendant Matteson") sent an email via the TeacherEase software program stating that he and Defendant Landers had been made aware of "a specific threat" to WGS and that

they had thoroughly investigated the threat. He stated further that the individual thought to have made the threat did not ride the bus and that a parent had brought them to school, where a search was completed to ensure this individual had no "method of acting out a threat…" The correspondence went on further to describe what can be likened to a game of telephone, when Defendant Matteson described the manner in which the threat was conveyed and assured parents they take every threat seriously, but do not discipline based on rumors or prejudice.

44.     Approximately thirty-two (32) minutes later, at 11:49 a.m., Defendant Landers sent an email via TeacherEase, to further explain the threat. Defendant Landers went on to explain that they had called in the LaSalle County Sheriff's Office and had a Deputy present at WGS that morning of March 31, 2023. Defendant Landers also stated that they had determined that the threat was not a credible threat towards school safety.

45.     At approximately 12:45 p.m., Friday, March 31, 2023, Defendant Landers sent yet another email via TeacherEase regarding "additional clarification," of the safety concern. Within this third email Defendant Landers again stated that there was not a credible threat and that the "rumored threat was being circulated last night … and was not credible prior to school this morning."

46.     During the day, at some point, Plaintiff A. Bartlett saw Defendant Landers in passing and asked him if he thought Plaintiff John Doe was owed an apology. Defendant Landers stated he thought "that would be the right thing to do." Defendant Landers also told Plaintiff A. Bartlett that "We are just going to have to put this behind us."

47.     During the Spring semester, and after the school shooting at Richnick Elementary, Plaintiff John Doe's class was having a discussion on the topic of school shootings and this incident in particular. During this discussion, the topic of racial stereotypes was broached. The subject of racial profiling and stereotyping in the wake of September 11, 2001, came up, and a student asked a question to the effect of, does that mean all white guys are going to be school shooters and how

would you know if someone was going to be a school shooter. At this point, a majority of students in Plaintiff John Doe's class turned around and looked at him. Plaintiff attempted to ask why everyone was looking at him, but he was cut off by the teacher telling him not to even joke about it. None of the other students were admonished in this manner.

48.     During the Winter semester, Plaintiff John Doe came home and told his Mother he had the best day ever at school. He and his friends were allowed to push each other into snow piles and Defendant Matteson was that Defendant Matteson was on recess duty and let them do it. However, the following day Plaintiff and his friends were not allowed to participate in recess and were told punching and kicking each other was not acceptable, taking it further by threatening to keep them inside for another week.

## <u>WALLACE GRADE SCHOOL POLICIES</u>

49.     At all times relevant, there was in effect Defendant WSG's multiple policies prohibiting any form of bullying, harassment, and discrimination. On their website, you can find their Student Handbook, wherein, in pertinent part located in paragraph 10 under the Section entitled Prohibited Student Conduct it states:

> Engaging in bullying, hazing or any kind of aggressive behavior that does physical or psychological harm to a staff person or another student or encouraging other students to engage in such behavior. Prohibited conduct specifically includes, without limitation, any use of violence, intimidation, force, noise, coercion, threats, stalking, harassment, sexual harassment, public humiliation, theft or destruction of property, retaliation, hazing, bullying, and bullying using a school computer or a school computer network or other comparable conduct.

50.     At all times relevant, there was in effect Defendant WGS's policy on Prevention of and Response to Bullying, Intimidation, and Harassment, which states in relevant part:

> Bullying, intimidation, and harassment diminish a student's ability to learn and a school's ability to educate. Preventing students from engaging in these disruptive behaviors and providing all students equal access to a safe, non-hostile learning environment are important district and school goals. Bullying on the basis of actual or perceived race, color, national origin, military status, unfavorable discharge status from the military service, sex,

11

sexual orientation, gender identity, gender-related identity or expression, ancestry, age, religion, physical or mental disability, order of protection status, status of being homeless, or actual or potential marital or parental status, including pregnancy, association with a person or group with one or more of the aforementioned actual or perceived characteristics, or any other distinguishing characteristic is prohibited in each of the following situations:

• During any school-sponsored education program or activity.

• While in school, on school property, on school buses or other school vehicles, at designated school bus stops waiting for the school bus, or at school-sponsored or school-sanctioned events or activities.

• Through the transmission of information from a school computer, a school computer network, or other similar electronic school equipment.

• Through the transmission of information from a computer that is accessed at a non-school-related location, activity, function, or program or from the use of technology or an electronic device that is not owned, leased, or used by the school district or school if the bullying causes a substantial disruption to the educational process or orderly operation of a school.

Bullying includes cyber-bullying and means any severe or pervasive physical or verbal act or conduct, including communications made in writing or electronically, directed toward a student or students that has or can be reasonably predicted to have the effect of one or more of the following:

• Placing the student or students in reasonable fear of harm to the student's or students' person or property;

• Causing a substantially detrimental effect on the student's or students' physical or mental health;

• Substantially interfering with the student's or students' academic performance; or

• Substantially interfering with the student's or students' ability to participate in or benefit from the services, activities, or privileges provided by a school.

Cyberbullying means bullying through the use of technology or any electronic communication, including without limitation any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic system, photo-electronic system, or photo-optical system, including without limitation electronic mail, Internet communications, instant messages, or facsimile communications.

Cyberbullying includes the creation of a webpage or weblog in which the creator assumes the identity of another person or the knowing impersonation of another person as the author of posted content or messages if the creation or impersonation creates any of the effects enumerated in the definition of bullying. Cyberbullying also includes the

distribution by electronic means of a communication to more than one person or the posting of material on an electronic medium that may be accessed by one or more persons if the distribution or posting creates any of the effects enumerated in the definition of bullying.

Bullying may take various forms, including without limitation one or more of the following: harassment, threats, intimidation, stalking, physical violence, sexual harassment, sexual violence, theft, public humiliation, destruction of property, or retaliation for asserting or alleging an act of bullying. This list is meant to be illustrative and non-exhaustive. Students are encouraged to immediately report bullying. A report may be made orally or in writing to the building principal, nondiscrimination coordinator, district complaint manager or any staff member with whom the student is comfortable speaking. All school staff members are available for help with a bully or to make a report about bullying. Anyone, including staff members and parents/guardians, who has information about actual or threatened bullying is encouraged to report it to the district complaint manager or any staff member. Anonymous reports are also accepted by phone call or in writing.

51. At all times relevant, there was in effect Defendant WGS's policy on Harassment & Teen Dating Violence Prohibited, *HARASSMENT PROHIBITED* which states:

No person, including a school or school district employee or agent, or student, shall harass, intimidate, or bully a student on the basis of actual or perceived: race; color; national origin; military status; unfavorable discharge status from military service; sex; sexual orientation; gender identity; gender-related identity or expression; ancestry; age; religion; physical or mental disability; order of protection status; status of being homeless; actual or potential marital or parental status, including pregnancy; association with a person or group with one or more of the aforementioned actual or perceived characteristics; or any other distinguishing characteristic. The District will not tolerate harassing, intimidating conduct, or bullying whether verbal, physical, sexual, or visual, that affects the tangible benefits of education, that unreasonably interferes with a student's educational performance, or that creates an intimidating, hostile, or offensive educational environment. Examples of prohibited conduct include name-calling, using derogatory slurs, stalking, sexual violence, causing psychological harm, threatening, or causing physical harm, threatened or actual destruction of property, or wearing or possessing items depicting or implying hatred or prejudice of one of the characteristics stated above.

52. At all times relevant, there was in effect Defendant WGS's policy on Making a Report or Complaint, which states:

Students are encouraged to promptly report claims or incidences of bullying, intimidation, harassment, sexual harassment, or any other prohibited conduct to the Nondiscrimination Coordinator, Building Principal, Assistant Building Principal, Dean of Students, a Complaint Manager, or any employee with whom the student is comfortable speaking. A student may choose to report to an employee of the student's same gender.

**COUNT I – CIVIL RIGHTS VIOLATION UNDER 42 U.S.C. § 1983: EQUAL PROTECTION AGAINST DEFENDANT WALLACE CCSD 195**

53.     The Plaintiff adopts and incorporates the allegations set forth in paragraphs 1-52 of this Complaint above, as though fully set forth in paragraph 53 herein.

54.     At all times relevant, Defendants were acting under color of law.

55.     That the above actions by Defendants have resulted in the denial of equal protection rights, as a "class of one," all in violation of the Fourteenth Amendment to the United States Constitution, as Plaintiff was harassed and bullied, all against his will, and differently than those similarly situated students.

56.     That the actions of Defendants were the result of utter indifference and conscious disregard against Plaintiff, and said actions and denials were taken without any rational basis.

57.     That by reason of the aforesaid actions, Defendants actions exhibit deliberate indifference to and/or reckless disregard for the constitutional rights of Plaintiff and other similarly situated students, all in violation of his constitutional rights.

58.     Plaintiff was intentionally treated differently from the rest of his peers and there was no rational basis for the disparate treatment, including being subject to harassment and bullying.

59.     Defendants did not take adequate actions to prevent or deter the conduct of students on the premises and allowed the bullying and harassment to happen.

60.     Defendants purport to follow the district policies outlined on the WGS website of zero tolerance for harassment and bullying.

61.     Defendant failed to follow its policies, including:

   (a)     Failing to protect Plaintiff from the reasonably foreseeable bullying and harassment he suffered on the premises.

   (b)     Failing to protect Plaintiff from the infliction of emotional distress he suffered on

14

the premises.

(c)     Failing to supervise student actions while on its premises.

(d)     Failing to ensure that its staff including teachers, administrators, and support staff were maintaining discipline as required by their own policies and procedures.

(e)     Failing to ensure staff including teachers, administrators, and support staff, accurately reported and investigated the bullying and harassment suffered by Plaintiff on the premises.

(f)     Failing to administer and follow in relevant part the WGS Prohibited Student Conduct policy.

(g)     Failing to administer and follow in relevant part the WGS policy on Prevention of and Response to Bullying, Intimidation, and Harassment.

(h)     Failing to administer and follow in relevant part the WGS policy on Harassment & Teen Dating Violence Prohibited, *HARASSMENT PROHIBITED*.

(i)     Allowing staff employees and/or agents, including but not limited to its teachers, administrators, and support staff to neglect Plaintiff by failing to create a safe learning environment for Plaintiff, and failing to intervene and protect Plaintiff from the known bullying and on its premises.

62.     As a direct and proximate result of one or more of the aforesaid acts and omissions by Defendants, Plaintiff suffered and continues to suffer a deprivation of his rights secured to her by the Fourteenth Amendment of the United State Constitution and is thus entitled to an award of monetary damages.

63.     As a direct and proximate result of one or more of the aforesaid acts and omissions by Defendants, Plaintiff suffered humiliation, fright, grief, worry, shame, and severe and extreme emotional distress.

WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory damages in an amount in excess of seventy-five thousand dollars ($75,000.00) and for their costs

and expenses and for all such and further relief as the Court deems to be fair and just.

## COUNT II – VIOLATION OF SECTION 504 OF THE REHABILITATION ACT 29 U.S.C. § 794 AGAINST DEFENDANT WALLACE CCSD 195

64.     The Plaintiff adopts and incorporates the allegations contained in paragraphs 1-63 above as if set forth in this paragraph 64 herein.

65.     Under Section 504 of the Rehabilitation Act, "[n]o otherwise qualified individual with a disability …shall, solely by reason of her of his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under…any program or activity conducted by any Executive agency… ." 29 U.S.C. § 794(a). The operations of Defendants are a "program or activity," which is defined to include all of the operations of agencies of a state and school systems. 29 U.S.C. § 794(b)(2)(B).

66.     The definition of "disability" is a "physical or mental impairment that substantially limits one or more major life activities," including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §§ 12102 (1)(A), (2)(A) (emphasis added).

67.     The effects of Plaintiff John Doe's impairment limit his ability to learn, comprehend, concentrate, think and/or communicate, and have the opportunity to succeed in school.

68.     There are effective and reasonable accommodations the Defendant could implement that would allow Plaintiff John Doe to learn, comprehend, concentrate, think, communicate, and enjoy the benefit of public education. The effects of Plaintiff John Doe's documented medical concerns and impairments can be addressed with behavioral and mental health resources, such as counseling and therapy, and an intuitive IEP, in order for him to have meaningful access to education. In order to meaningfully access his right to public education, Plaintiff John Doe requires a system of

16

education and educators responsive to and capable of addressing his additional needs. Defendants have failed to follow the laws, systems, procedures, and training tools to ensure Plaintiff John Doe, receives the specialized instruction, related services, and other necessary resources to access the benefits of public education.

69. The Plaintiffs have been damaged by the failure of Defendants to provide a system for serving students suffering from learning impairment issues, depriving Plaintiff John Doe of his right to access public education.

70. The Plaintiffs have suffered irreparable harm that in no way can be adequately remedied or compensated by law, Plaintiffs are entitled to equitable remedy, and equitable remedy is in the public interest. Plaintiffs are entitled to equitable relief.

71. The Plaintiffs have suffered irreparable harm that in no way can be adequately remedied or compensated by law; Plaintiffs are entitled to an equitable remedy, and equitable remedy is in the public interest. Accordingly, the Plaintiffs are entitled to equitable relief.

WHEREFORE, Plaintiffs demand judgment against the Defendants for compensatory damages in an amount in excess of seventy-five thousand dollars ($75,000.00) and for all such further relief as the Court deems to be fair and just.

**COUNT III - DEFENDANT VIOLATED TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §12131 et. seq. AGAINST DEFENDANT WALLACE CCSD 195**

72. Plaintiffs adopt and incorporate paragraphs 1-71 in this paragraph 72 as if fully set forth herein.

73. Title II of the ADA and its regulations provide that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. " 42 U.S.C. §12132 (See also 28 C.F.R. Part 35).

74. Defendant Wallace CCSD 195 is a public entity subject to Title II of the ADA, 42 U.S.C. §12131.

75. Plaintiff John Doe is a person with a disability within the meaning of 42 U.S.C. §12102.953.

76. Defendant Wallace CCSD 195 intentionally violated John Doe rights under the ADA regulations by excluding him from participating in and denying him the benefits of Defendants' 504 Plan services, programs, and activities, on the basis of his disability, and by subjecting him to discrimination in violation of 42 U.S.C. §12132.

77. Defendant otherwise intentionally discriminated against John Doe in violation of 42 U.S.C. §12132.

78. As a direct and proximate cause of Defendants' violations of the ADA, John Doe has suffered and continues to suffer severe and grievous mental and emotion suffering, humiliation, stigma, and other injuries he will continue to suffer.

WHEREFORE, Plaintiffs demand judgment against the Defendants for money damages in excess of seventy-five thousand dollars ($75,000.00), interest on any damages awarded, reasonable attorney fees and costs under 42 U.S.C. § 1988 and/or other applicable statutes; and for all such and further relief as the Court deems to be fair and just.

## COUNT IV – AGAINST DEFENDANT WALLACE CCSD 195 WILLFUL AND WANTON SUPERVISION

79. Plaintiff adopts and incorporates the allegations contained in paragraphs 1-78 above as if set forth in this paragraph 79 herein.

80. An actor in a special relationship with another owes the other a duty of reasonable care with regard to risks that arise within the scope of the relationship. A special relationship giving rise to this duty includes a school with its students. §40 - Duty Based on Special Relationship with Another. §40 A Concise Restatement of Torts 3rd Edition.

81. An actor in a special relationship with another owes a duty of reasonable care to third parties with regard to risks posed by the other that arise with the scope of the relationship. §41 - Duty to Third Parties Based on Special Relationship with Person Posing Risks. A Concise Restatement of Torts 3rd Edition.

82. An actor who undertakes to render services to another who knows or should know that the services will reduce the risk of physical harm to the other has a duty of reasonable care to the other in conducting the undertaking if: (a) the failure to exercise such care increases the risk of harm beyond that which

18

existed without the undertaking, or (b) the person to whom the services are rendered or another relies on the actor's exercising reasonable care in the undertaking. §42 Duty Based on Undertaking. A Concise Restatement of Torts 3rd Edition.

83. One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of her normal power of self-protection or to subject her to association with persons likely to harm her, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to her, if the actor (a) knows or has reason to know that he has the ability to control the conduct of the third persons, and (b) knows or should know of the necessity and opportunity for exercising such control. Restatement of Torts – Standard of Conduct § 320. Duty of Persons Having Custody of Another to Control Conduct of Third Persons.

84. Restatement of Torts – Standard of Conduct § 323. Negligent Performance of undertaking to Render Services. One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

85. At all times relevant, Defendant Wallace CCSD 195 had a duty to exercise reasonable care in the supervision of its employees and/or agents, including but not limited to its teachers, administrators, and support staff.

86. At all times relevant, Defendant Wallace CCSD 195 had a duty to protect Plaintiff from the ongoing known bullying and harassment by students, year after year.

87. At all times relevant, Defendant Wallace CCSD 195 had a duty to exercise reasonable care in the supervision of those on its premises, including all Defendants in this Complaint.

88. At all times relevant, Defendant Wallace CCSD 195 knew, or should have known that Plaintiff was being bullied and harassed on its premises.

19

89. At all times relevant, Defendant Wallace CCSD 195 knew, or should have known that Plaintiff was the constant target of bullying and harassment.

90. At all times relevant, Defendant Wallace CCSD 195 knew or should have known that its agents and employees, including its teachers, administrators, and support staff failed to prevent or protect Plaintiff from the bullying and harassment at the hands of many students over a period of years on its premises.

91. At all relevant times, Defendant Wallace CCSD 195 had a duty to abide by all applicable federal, state, and local laws.

92. At all relevant times, Defendant Wallace CCSD 195 had a duty to comply with and follow its own policies and procedures, as set forth on their website, in responding to, investigating, disciplining, preventing, and reporting the bullying and harassment faced by Plaintiff, in order to prevent and deter future incidents.

93. At all relevant times, Defendant Wallace CCSD 195 had a duty to protect and keep safe Plaintiff's mental health and well-being, physical well-being, emotional well-being, and to prevent and intervene where the bullying and harassment threat were known or should have been known by all Defendants.

94. In violation of its duties as aforesaid, Defendant Wallace CCSD 195 did commit one or more of the following acts or omissions:

(a) Willfully and wantonly failed to protect Plaintiff from the reasonably foreseeable bullying and harassment by all Defendants.

(b) Willfully and wantonly failed to protect Plaintiff from the infliction of emotional distress from all Defendants.

(c) Willfully and wantonly failed to supervise all Defendants actions while on its premises.

(d) Willfully and wantonly failed to ensure that its staff including teachers, administrators, and support staff were maintaining discipline as required by its own policies and

20

procedures.

(e)     Willfully and wantonly failed to ensure that its staff including teachers, administrators, and support staff accurately reported and investigated Defendants bullying and harassment.

(f)     Willfully and wantonly violated in relevant part its own Prohibited Student Conduct policy.

(g)     Willfully and wantonly violated in relevant part its own policy on Prevention of and Response to Bullying, Intimidation, and Harassment.

(h)     Willfully and wantonly violated in relevant part its own policy on Harassment & Teen Dating Violence Prohibited, *HARASSMENT PROHIBITED*.

(i)     Willfully and wantonly allowed all Defendants, staff employees and/or agents, including but not limited to its teachers, administrators, and support staff to neglect Plaintiff by failing to create a safe learning environment for Plaintiff, and failing to intervene and protect Plaintiff from the known bullying and harassment.

95.     As a direct and proximate result of Defendant Wallace CCSD 195's conduct, Plaintiff has suffered and will continue to suffer severe emotional distress, resulting in physical manifestations, embarrassment, loss of self-esteem, humiliation, and psychological injuries.

WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory damages in an amount in excess of seventy-five thousand dollars ($75,000.00) and for their costs and expenses and for all such and further relief as the Court deems to be fair and just.

<u>**COUNT V – WILLFUL AND WANTON CONDUCT**</u>
<u>**AGAINST DEFENDANTS MATTESON AND LANDERS**</u>

96.     Plaintiff adopts and incorporates the allegations in paragraphs 1-95 above as if set forth in this paragraph 91 within.

97.     An actor in a special relationship with another owes the other a duty of reasonable care with regard to risks that arise within the scope of the relationship.  A special relationship giving rise to this duty includes a school with its students.  §40 - Duty Based on Special Relationship with Another. §40 A Concise Restatement of Torts 3rd Edition.

21

98. An actor in a special relationship with another owes a duty of reasonable care to third parties with regard to risks posed by the other that arise with the scope of the relationship. §41 - Duty to Third Parties Based on Special Relationship with Person Posing Risks. A Concise Restatement of Torts 3rd Edition.

99. An actor who undertakes to render services to another who knows or should know that the services will reduce the risk of physical harm to the other has a duty of reasonable care to the other in conducting the undertaking if: (a) the failure to exercise such care increases the risk of harm beyond that which existed without the undertaking, or (b) the person to whom the services are rendered or another relies on the actor's exercising reasonable care in the undertaking. §42 Duty Based on Undertaking. A Concise Restatement of Torts 3rd Edition.

100. One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of her normal power of self-protection or to subject her to association with persons likely to harm her, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to her, if the actor (a) knows or has reason to know that he has the ability to control the conduct of the third persons, and (b) knows or should know of the necessity and opportunity for exercising such control. Restatement of Torts – Standard of Conduct § 320. Duty of Persons Having Custody of Another to Control Conduct of Third Persons.

101. Restatement of Torts – Standard of Conduct § 323. Negligent Performance of undertaking to Render Services. One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

102. At all times relevant, Defendants Matteson and Landers had a duty to protect Plaintiff from the ongoing known bullying and harassment by students, year after year.

103. At all times relevant, Defendants Matteson and Landers had a duty to exercise reasonable care in the supervision of those on its premises.

104. At all times relevant, Defendants Matteson and Landers knew, or should have known that Plaintiff was being bullied and harassed on its premises.

105. At all times relevant, Defendants Matteson and Landers knew, or should have known that Plaintiff was the constant target of bullying and harassment.

106. At all times relevant, Defendants Matteson and Landers knew or should have known that agents and employees, including teachers and support staff failed to prevent or protect Plaintiff from the bullying and harassment at the hands of many students over a period of years on its premises.

107. At all relevant times, Defendants Matteson and Landers had a duty to abide by all applicable federal, state, and local laws.

108. At all relevant times, Defendants Matteson and Landers had a duty to comply with and follow the policies and procedures, as set forth on Defendant WGS's website, in responding to, investigating, disciplining, preventing, and reporting the bullying and harassment faced by Plaintiff, in order to prevent and deter future incidents.

109. At all relevant times, Defendants Matteson and Landers had a duty to protect and keep safe Plaintiff's mental health and well-being, physical well-being, emotional well-being, and to prevent and intervene where the bullying and harassment threat were known or should have been known.

110. In violation of its duties as aforesaid, Defendants Wallace CCSD 195 did commit one or more of the following acts or omissions:

(a) Willfully and wantonly failed to protect Plaintiff from the reasonably foreseeable bullying and harassment.

(b) Willfully and wantonly failed to protect Plaintiff from the infliction of emotional distress.

(c) Willfully and wantonly failed to ensure that its staff including teachers and support staff were maintaining discipline as required by its own policies and procedures.

(d) Willfully and wantonly failed to ensure that its staff including teachers and support staff accurately reported and investigated Defendants bullying and harassment.

(e) Willfully and wantonly violated in relevant part the WGS Prohibited Student Conduct

policy.

(f)      Willfully and wantonly violated in relevant part the WGS policy on Prevention of and Response to Bullying, Intimidation, and Harassment.

(g)      Willfully and wantonly violated in relevant part the WGS policy on Harassment & Teen Dating Violence Prohibited, *HARASSMENT PROHIBITED*.

(h)      Willfully and wantonly allowed staff employees and/or agents, including but not limited to teachers and support staff to neglect Plaintiff by failing to create a safe learning environment for Plaintiff, and failing to intervene and protect Plaintiff from the known bullying and harassment.

111.    As a direct and proximate result of Defendants Matteson and Landers' conduct, Plaintiff has suffered and will continue to suffer severe emotional distress, resulting in physical manifestations, embarrassment, loss of self-esteem, humiliation, and psychological injuries.

WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory damages in an amount in excess of seventy-five thousand dollars ($75,000.00) and for their costs and expenses and for all such and further relief as the Court deems to be fair and just.

## COUNT VI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – AGAINST ALL DEFENDANTS

112.    The Plaintiff adopts and incorporates the allegations set forth in paragraphs 1-111 of this Complaint above, as though fully set forth in paragraph 102 herein.

113.    At all times relevant, Defendants owed Plaintiff a duty of protecting him from the bullying, and harassment and knew or should have known what was happening at the hands of other students on the premises.

114.    At all times relevant, Defendants by and through its teachers, administrators, and support staff held a position of power and authority over Plaintiff while he was on the premises.

115.    At all times relevant, Defendants knew or should have known that Plaintiff did not consent to the bullying and harassment he was being subjected to while on the premises.

116.    At all times relevant, Defendants committed extreme and outrageous acts by condoning, approving of, and otherwise allowing the bullying and harassment against Plaintiff to continue unfettered.

117.    At all times relevant, Defendants committed extreme and outrageous acts by condoning,

24

fostering, approving, and/or failing to eradicate a toxic culture of bullying and harassment among its students on the premises.

118. At all times relevant, Defendants intentionally refrained from taking action to enforce its own policies, procedures, rules, and regulations, as well as federal laws against ongoing bullying and harassment despite knowledge of said misconduct.

119. Defendants engaged in extreme and outrageous conduct by ignoring verbal abuse and harassment and bullying endured by Plaintiff, despite possessing information and/or witnessing events to the contrary, tolerating bullying and harassment in direct violation of its own policies, detrimentally effecting Plaintiff's mental health and substantially interfering with Plaintiff's academic performance and ability to benefit from school services, not observing, supervising, or investigating allegations of bullying and harassment; allowing students who engaged in the bullying and harassment around Plaintiff; not taking requisite action to discipline students involved in the bullying and harassment and providing no viable solution whatsoever to address Plaintiff's safety concerns.

120. Defendants acted with willful malice and knowledge of or with conscious disregard of the harm that would be inflicted upon Plaintiff by allowing students partaking in the bullying and harassment to be unsupervised on the premises.

121. Defendants' conduct caused the Plaintiff to suffer fright, grief, worry, shame, humiliation, and severe or extreme emotional distress.

122. Defendants' conduct actually and proximately caused emotional distress and proximately caused the Plaintiff to suffer injuries, including injuries to his reputation.

WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory damages in an amount in excess of seventy-five thousand dollars ($75,000.00) and for their costs and expenses and for all such and further relief as the Court deems to be fair and just.

Respectfully submitted,

**JOHN DOE, a minor, by and through his next Friends, DONOVAN BARTLETT, and AMBER BARTLETT**

25

By:  /s/ John C. Kreamer
One of their Attorneys

John C. Kreamer
Kreamer Law Group, LLC
1100 E. Warrenville Rd., Ste.135
Naperville, Illinois 60563
T.  630- 857-3609
F. 630-597-9532
Firm #45899
Email: jckreamer@kreamerlawgroup.com

26